## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRITTANY BALLARD-HOLMES and HUNTER THOMAS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| RUSH STREET GAMING, LLC and SUGARHOUSE HSP GAMING, L.P. d/b/a RIVERS CASINO PHILADELPHIA, | |
| Defendant. | |

Plaintiffs Brittany Ballard-Holmes and Hunter Thomas (collectively, "Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons ("Plaintiffs and Class Members"), alleges the following against Rush Street Gaming LLC ("Rush Street Gaming") and Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia ("Rivers Casino") (collectively, "Defendants"). The following allegations are based on Plaintiff's knowledge, investigations by Plaintiff's counsel, facts of public record, and information and belief:

## NATURE OF THE ACTION

1.      Plaintiffs seek to hold Defendants responsible for the injuries Defendants inflicted on Plaintiffs and Class Members due to Defendants' egregiously inadequate data security, which resulted in the private information of Plaintiffs and those similarly situated to be exposed to unauthorized third parties (the "Data Breach").

2.      Defendants operate a casino and offer other entertainment products/services in Philadelphia, Pennsylvania.

3.     The data that Defendants exposed to the public is unique and highly sensitive. For one, the exposed data included personal identifying information ("PII"), including names, Social Security numbers, and bank account information (collectively "Private Information").

4.     Plaintiffs and Class Members provided this information to Defendants with the understanding that Defendants would keep that information private in accordance with both state and federal laws.

5.     On December 30, 2024, Defendants publicly disclosed the Data Breach to the public. In the public notice, Defendants stated that, on November 18, 2024, they determined that an unauthorized threat actor had accessed and/or stolen from its computer servers the Private Information of Plaintiffs and Class Members. Upon information and belief, the actual Data Breach occurred before November 18, 2024.

6.     Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement reasonable measures to safeguard Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendants' woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of their negligence.

7.     Exacerbating the injuries to Plaintiffs and Class Members, Defendants failed to provide timely notice to Plaintiffs and Class Members, depriving them of the chance to take speedy measures to protect themselves and mitigate harm.

8.     Today, the Private Information of Plaintiffs and Class Members continue to be in jeopardy because of Defendants' actions and inactions described herein. Plaintiffs and Class Members now suffer from a heightened and imminent risk of fraud and identity theft for years to come and now must constantly monitor their financial and other accounts for unauthorized activity.

9.     The PII exposed in the Data Breach can enable criminals to commit a litany of crimes. Criminals can open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' health information to craft phishing and other hacking attacks based on Class Members' individual health needs, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

10.     As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) illegal sales of the compromised Private Information; (f) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (g) identity theft insurance costs; (h) "out of pocket" costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) anxiety, annoyance, and nuisance; (k) continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information; and (l) disgorgement damages associated with Defendants' maintenance and use of Plaintiffs' data for their benefit and profit.

11.     Through this action, Plaintiffs seek to remedy these injuries on behalf of themselves and all similarly situated individuals whose Private Information was exposed and compromised in the Data Breach.

12.     Plaintiffs bring this action against Defendants and asserts claims for negligence, negligence *per se*, unjust enrichment, breach of implied contract, breach of fiduciary duty, and declaratory/injunctive relief.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. And minimal diversity is established because Plaintiffs (and many members of the Nationwide Class) are citizens of states different than Defendants.

14.     This Court has general personal jurisdiction over Defendants because Defendants maintain their principal place of business in Pennsylvania, conduct substantial business in Pennsylvania and in this district through their principal place of business; engaged in the conduct at issue herein from and within this District; and otherwise has substantial contacts with this District and purposely availed themselves of the Courts in this District.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the claims emanated from activities within this District, and Defendants conduct substantial business in this District.

## PARTIES

16.     Plaintiff Hunter Thomas is a natural person, resident, and citizen of Hershey, Pennsylvania.

17.     Plaintiff Brittany Ballard-Holmes is a natural person, resident, and citizen of Philadelphia, PA.

18.     Plaintiffs are customers of Defendants' casino, and provided their PII as a condition of obtaining entertainment products/services from Defendants.

19.     Defendant Rush Street Gaming, LLC is a limited liability company registered in Delaware, and, upon information and belief, is headquartered in Chicago, Illinois.

20.     Defendant Sugarhouse HSP Gaming, L.P. d/b/a Rivers Casino Philadelphia, is a Delaware limited partnership with its principal place of business at 1001 North Delaware Avenue, Philadelphia, PA 19123.

## FACTUAL ALLEGATIONS

***Defendants Collected and Stored the Private Information of Plaintiffs and Class Members***

21.     Defendants jointly operate a casino and offer other entertainment products/services in Philadelphia, Pennsylvania.

22.     Plaintiffs and Class Members provided their Private Information to Defendants as a requirement to obtain entertainment products and/or services from Defendants.

23.     Defendants collect Private Information from Plaintiffs and Class Members such as their name, Social Security number, and bank account information in the ordinary course of business. Upon information and belief, this Private Information is then stored on Defendants' systems.

24.     Because of the highly sensitive and personal nature of the information Defendants acquire and store, they knew or reasonably should have known that it must comply with healthcare industry standards related to data security and all federal and state laws protecting Private

Information and provide adequate notice if Private Information is disclosed without proper authorization.

25.     Plaintiffs and Class Members provided their Private Information to Defendants as a condition of receiving services from Rivers Casino, but in doing so, expected Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Data Breach

26.     On December 30, 2024, Defendants—through River Casino—posted on the Vermont Attorney General's website a generic data breach notice, notifying the public of the following:

> Rivers Casino Philadelphia recognizes the importance of protecting the personal information we maintain. We are writing to let you know of a data security incident that may have involved some of your information. This notice explains the incident, measures we have taken, and some additional steps you may consider taking in response.
>
> We recently responded to and investigated an incident that involved unauthorized access to certain Rivers Casino Philadelphia computer systems. No other Rivers Casino locations were involved. Upon identifying the incident, we immediately secured the involved systems and launched an investigation. Through the investigation, we determined that <<variable text>> an unauthorized actor accessed and/or took certain files stored on our computer servers. We reviewed the files that may have been involved and on November 18, 2024, we determined that one or more file(s) contained your name and one or more of the following: Social Security number, and/or bank account information used for direct deposit.
>
> We regret any inconvenience or concern this incident may cause you. We have arranged for you to receive a complimentary one-year membership to credit monitoring services. Enrolling in these services will not hurt your credit score. For more information on the credit monitoring services, including instructions on how to activate your complimentary membership, as well as some additional steps you can take in response to this incident, please see the pages that follow this letter. [1]

---

[1] *2024-12-30 Rivers Casino Philadelphia Data Breach Notice to Consumers*, Rivers Casino Philadelphia (Dec. 30, 2024), https://ago.vermont.gov/sites/ago/files/documents/2024-12-30%20Rivers%20Casino%20Philadelphia%20Data%20Breach%20Notice%20to%20Consumers.pdf (last accessed Jan. 29, 2025)

27.     Upon information and belief, Plaintiffs' and Class Members' affected Private Information at the time of the Data Breach was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

28.     Upon information and belief, Defendants began mailing written notices of the Data Breach on or about December 30, 2024.[2]

29.     Defendants were targeted due to their statuses as entities that collect, create, and maintain Private Information.

30.     The online data breach notice gives no details to Plaintiffs or Class Members regarding the manner and means of how their Private Information was disclosed and leaves Plaintiffs and Class Members wondering how they can protect themselves.

31.     Time is of the essence when highly sensitive Private Information is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired Private Information of Plaintiffs and Class Members is now likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted Private Information to criminals.

32.     Plaintiffs and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their Private Information, especially their Social Security numbers and sensitive medical information, onto the Dark Web. Plaintiffs and Class Members face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing hundreds of thousands of Social Security numbers and/or specific, sensitive medical information.

---

[2] *Lawsuits filed in wake of Rivers Casino Philadelphia data breach*, 6abc Action News (Jan. 8, 2025), https://6abc.com/post/lawsuits-filed-wake-rivers-casino-philadelphia-data-breach/15775195/ (last accessed Jan. 29, 2025)

33.     Defendants largely put the burden on Plaintiffs and Class Members to take measures to protect themselves from identity theft and fraud.

34.     Seemingly Defendants plan to offer at least some of those impacted by the Data Breach credit monitoring services for twelve (12) months. Such measures, however, are insufficient to protect Plaintiffs and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiffs and Class Members seek a sum of money sufficient to provide to Plaintiffs and Class Members identity theft protection services for their respective lifetimes.

35.     Plaintiffs and the Class Members remain in the dark regarding exactly what data was stolen, the particular method of disclosure, the results of any investigations, and what steps are being taken, if any, to secure their Private Information going forward. Plaintiffs and Class Members are left to speculate as to the full impact of the Data Breach and how exactly Defendants intend to enhance their information security systems and monitoring capabilities so as to prevent further breaches.

36.     Defendants could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting their servers and systems, generally, as well as Plaintiffs' and Class Members' Private Information.

37.     Defendants' negligence in safeguarding Plaintiffs' and Class Members' PII was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

38.     Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.6% of U.S.-based workers are compensated on an hourly basis, while the other 44.4% are salaried.[3]

39.     According to the American Time Use Survey, American adults have between 4 to 6 hours of "leisure time" outside of work per day;[4] examples of leisure time include partaking in sports, exercise and recreation; socializing and communicating; watching TV; reading; thinking/relaxing; playing games and computer use for leisure; and other leisure activities.[5] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

40.     Plaintiffs and Class Members are deprived of the choice as to how to spend their valuable free hours and therefore seek renumeration for the loss of valuable time as another element of damages.

***The Value of PII***

41.     Malicious actors can use stolen personal information to, *inter alia*, create synthetic identities (which are harder for authorities to detect), execute credible phishing attacks, and sell the personal information on underground markets in the dark web.[6]

---

[3] *Characteristics of minimum wage workers, 2022*, U.S. Bureau of Labor Statistics (Aug. 2023), https://www.bls.gov/opub/reports/minimum-wage/2022/home.htm (last accessed on Aug. 6, 2024).
[4] *Americans have no idea how to use their free time*, Business Insider (Mar. 26, 2024), https://www.businessinsider.com/americans-free-time-leisure-dont-use-television-2024-3 (last accessed on Aug. 6, 2024).
[5] *Table 11A. Time spent in leisure and sports activities for the civilian population by selected characteristics, averages per day, 2022 annual averages*, U.S. Bureau of Labor Statistics (June 22, 2023), https://www.bls.gov/news.release/atus.t11A.htm (last accessed on Aug. 6, 2024).
[6] *What Data Do Cybercriminals Steal? (How To Protect Yours)*, Identity Guard (Feb. 14, 2024), https://www.identityguard.com/news/what-information-do-cyber-criminals-steal.

42.     One example is when the U.S. Department of Justice announced its seizure of RaidForums in 2022. RaidForums was an online marketplace popular for cybercriminals to purchase and sell hacked data belonging to millions of individuals around the world.[7] "One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

43.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. According to Prey, a company that develops device tracking and recovery software, stolen PII and can be worth up to $2,000.00 depending on the type of information obtained.[9]

44.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. Such fraudulent uses include opening fraudulent credit cards and bank accounts, filing or collecting tax returns, accessing government benefits, applying for loans, and receiving healthcare. "If not spotted and resolved, these types of identity theft can rack up financial debt and do extensive damage to a person's credit, making

---

[7] *United States Leads Seizure of One of the World's Largest Hacker Forums and Arrests Administrator*, U.S. Dept. of Justice (Apr. 12, 2022), https://www.justice.gov/opa/pr/united-states-leads-seizure-one-world-s-largest-hacker-forums-and-arrests-administrator.
[8] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.
[9] Juan Hernandez, *The Lifecycle of Stolen Credentials on the Dark Web*, Prey (Feb. 26, 2024), https://preyproject.com/blog/lifecycle-stolen-credentials-dark-web.

things like obtaining a loan to buy a car or house difficult or even impossible."[10]

45.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

46.     Even then, a new Social Security number may not be effective. "When issuing a new SSN, the Social Security Administration (SSA) links your old number to your new one so you'll still be associated with all wages earned."[11]

47.     Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than other types of data because the information compromised in this Data Breach is difficult, if not impossible, to change.

48.     The PII compromised in the Data Breach also demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[12]

49.     Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

---

[10] *What to do if someone has your Social Security number*, AllState (Jan. 24, 2024),
https://www.allstateidentityprotection.com/content-hub/stolen-social-security-number.
[11] *What Happens if I Change My Social Security Number*, LendingTree (Mar. 15, 2023),
https://www.lendingtree.com/credit-repair/credit-score-after-getting-a-new-social-security-number/.
[12] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World,
(Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-
sells- for- 10x- price-of-stolen-credit-card-numbers.html (last visited Jan. 17, 2024).

50.    According to the FBI's Internet Crime Complaint Center (IC3) 2023 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $12.5 billion in losses to individuals and business victims.[13]

51.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

52.    Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

53.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[14] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[15]

54.    The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm (including identity theft) that is continuing

---

[13] *2023 Internet Crime Report*, Fed. Bureau of Investig. (2023),
https://www.ic3.gov/Media/PDF/AnnualReport/2023_IC3Report.pdf (last accessed Apr. 11, 2024).
[14] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007),
https://www.gao.gov/assets/gao- 07-737.pdf (last visited Jan. 17, 2024).
[15] *Id*.

and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off of this highly sensitive information.

***Defendants Failed to Comply with the FTC Act and Failed to Observe Reasonable and Adequate Data Security Measures***

55.     The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[16]

56.     Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[17]

57.     The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

58.     The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for

---

[16] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf.
[17] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited April 17, 2024).

suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[18]

59.    The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

60.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

61.    Plaintiffs and Class Members gave their PII to Defendants with the reasonable expectation and understanding that Defendants would comply with their duty to keep such information confidential and secure from unauthorized access.

62.    In their online "Privacy Policy," Defendants provide the following representations about the supposed privacy of Plaintiffs' and Class Members' Private Information:

> **SECURITY**
> Rush Street Gaming takes reasonable measures to help protect information about you from loss, theft, misuse and unauthorized access, disclosure, alteration and destruction.[19]

---

[18] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023),
https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf.
[19] *Privacy Policy*, Rivers Casino Philadelphia, https://www.riverscasino.com/philadelphia/privacy-policy (last accessed Jan. 29, 2025).

63.     Defendants have been on notice for years that Plaintiffs' and Class Members' PII was a target for bad actors because of, among other motives, the high value of the PII created, collected, and maintained by Defendants.

64.     Despite such awareness, Defendants failed to impose and maintain reasonable and appropriate data security controls to protect Plaintiffs' and Class Members' PII from unauthorized access that Defendants should have anticipated and guarded against.

65.     Defendants were fully aware of their obligation to protect the PII of their customers because of its collection, storage, and maintenance of PII. Defendants were also aware of the significant consequences that would ensue if they failed to do so because Defendants collected, stored, and maintained sensitive private information from numerous individuals and knew that this information, if hacked, would result in injury to Plaintiffs and Class Members.

66.     Despite understanding the consequences of insufficient data security, Defendants failed to adequately protect Plaintiffs' and Class Members' PII, permitting bad actors to access and misuse it.

***Defendants Failed to Comply with Industry Standards***

67.     Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[20] All organizations collecting and handling PII, such as Defendants, are strongly encouraged to follow these controls.

---

[20] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), available at https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Jan. 17, 2024).

68.    Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[21]

69.    Several best practices have been identified that a minimum should be implemented by companies like Defendants, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[22]

70.    Other best practices have been identified that a minimum should be implemented by companies like Defendants, including but not limited to ensuring that PII is only shared with third parties when reasonably necessary and that those vendors have appropriate cybersecurity systems and protocols in place.[23]

71.    Defendants failed to follow these and other industry standards to adequately protect the PII of Plaintiffs and Class Members.

***The Data Breach Caused Harm and Will Result in Additional Fraud***

72.    Without detailed disclosure to the victims of the Data Breach, individuals whose PII was compromised by the Data Breach, including Plaintiffs and Class Members, were unknowingly and unwittingly exposed to continued misuse and ongoing risk of misuse of their PII for months without being able to take available precautions to prevent imminent harm.

---

[21] *See CIS Benchmarks FAQ*, Center for Internet Security, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited Jan. 17, 2024).
[22] *See* Center for Internet Security, *Critical Security Controls* (May 2021), available at https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Jan. 17, 2024).
[23] *See id*.

73.    The ramifications of Defendants' failure to secure Plaintiffs' and Class Members' data are severe.

74.    Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.

75.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[25]

76.    Identity thieves can use PII, such as that of Plaintiffs and Class Members, which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

77.    As demonstrated herein, these and other instances of fraudulent misuse of the compromised PII has already occurred and are likely to continue.

78.    As a result of Defendants' delay between the Data Breach and the data breach notices sent to affected persons, the risk of fraud for Plaintiffs and Class Members increased exponentially.

---

[24] 17 C.F.R § 248.201 (2013).

[25] *Id.*

79.     Javelin Strategy and Research reports that identity thieves have stolen $43 billion in 2022.[26]

80.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. According to Experian, a credit monitoring company, "it takes an average of six months and roughly 200 hours of work to recover your identity after it's been compromised."[27]

81.     There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

82.     Thus, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

***Plaintiffs' Experiences with the Data Breach***

**A.  <u>Plaintiff Hunter Thomas</u>**

83.     Plaintiff Hunter Thomas, a customer of Defendants' entertainment products and services, provided his PII to Defendants—including name, Social Security number, and bank

---

[26] *See Identity Fraud Losses Totaled $43 Billion in 2022, Affecting 40 Million U.S. Adults*, Javelin (Mar. 28, 2023), https://javelinstrategy.com/press-release/identity-fraud-losses-totaled-43-billion-2022-affecting-40-million-us-adults
[27] Gayle Soto, *The Unexpected Costs of Identity Theft*, Experian (Sept. 30, 2020), https://www.experian.com/blogs/ask-experian/what-are-unexpected-costs-of-identity-theft/
[28] GAO, *Report to Congressional Requesters*, at 29 (June 2007), available at http://www.gao.gov/new.items/d07737.pdf (last visited Jan. 17, 2024).

account information—and upon information and belief, that PII was stored and maintained by Defendants.

84.     Plaintiff has an account on Defendants' "BetRivers Casino & Sportsbook" mobile application, which allows users, including Plaintiffs and Class Members, to play online casino games, bet on sports matches, and partake in bonus/loyalty programs.[29]

85.     To create and obtain an account on the Defendants' mobile application, users— including Plaintiffs and Class Members—must register a payment card and enter their Social Security number into the application.

86.     Plaintiff Thomas was required to divulge his PII to Defendants, including his Social Security number and payment card information, as a condition to use Defendants' mobile application for Defendants' entertainment services and products.

87.     Plaintiff values his privacy and makes every effort to keep his personal information private.

88.     Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained Plaintiff's private information.

89.     Plaintiff is now forced to live with the anxiety that his PII is being disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving him of any right to privacy whatsoever.

90.     As a result of the Data Breach, Plaintiff has had to spend over five (5) hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of:

---

[29] *BetRivers Casino & Sportsbook*, Google Play,
https://play.google.com/store/apps/details?id=com.rush.ri&hl=en_US&pli=1 (last accessed Feb. 5, 2025).

monitoring accounts to detect suspicious and fraudulent activity to mitigate against potential harm; and researching the potential consequences of the Data Breach.

91.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen.

92.     Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in Plaintiff's name, medical services billed in Plaintiff's name, tax return fraud, utility bills opened in Plaintiff's name, credit card fraud, and similar identity theft.

## B.  Plaintiff Brittany Ballard-Holmes

93.     Plaintiff Brittany Ballard-Holmes, a customer of Defendants' entertainment products and services, provided her PII to Defendants—including name, Social Security number, and bank account information—and upon information and belief, that PII was stored and maintained by Defendants.

94.     Plaintiff received a letter from Defendants, dated December 30, 2024, notifying her of the Data Breach and of the unauthorized exposure of her PII. In the letter, Defendants informed Plaintiff that, on November 18, 2024, "one or more file(s) [accessed and/or taken by an unauthorized actor] contained your name and one or more of the following: Social Security number, and/or bank account information used for direct deposit."

95.     Plaintiff values her privacy and makes every effort to keep his personal information private.

96.     After learning of the Data Breach, Plaintiff subsequently took steps to obtain a credit freeze as a result of learning this information.

97.     Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained Plaintiff's private information.

98.     Plaintiff is now forced to live with the anxiety that her PII is being disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving her of any right to privacy whatsoever.

99.     As a result of the Data Breach, Plaintiff has had to spend over five (5) hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring accounts to detect suspicious and fraudulent activity to mitigate against potential harm; and researching the potential consequences of the Data Breach.

100.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in Plaintiff's name, medical services billed in Plaintiff's name, tax return fraud, utility bills opened in Plaintiff's name, credit card fraud, and similar identity theft.

***Plaintiffs and Class Members Suffered Damages***

101.     The Data Breach was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Defendants' failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

102.     Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they would have prevented intrusion into its information storage and security systems and, ultimately, the theft of the PII of numerous individuals.

103.     As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class Members have already been harmed by the fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam email, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

104.     Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.   theft and misuse of their personal and financial information;

    b.   the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and misused

via the sale of Plaintiffs' and Class Members' information on the Internet's black

market;

c.  the untimely and inadequate notification of the Data Breach;

d.  the improper disclosure of their PII;

e.  loss of privacy;

f.  ascertainable losses in the form of out-of-pocket expenses and the value of their

time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g.  ascertainable losses in the form of deprivation of the value of their PII, for which

there is a well-established national and international market; and,

h.  the loss of productivity and value of their time spent to address, attempt to

ameliorate, mitigate, and deal with the actual and future consequences of the Data

Breach, including finding fraudulent charges, cancelling and reissuing cards,

purchasing credit monitoring and identity theft protection services, imposition of

withdrawal and purchase limits on compromised accounts, and the inconvenience,

nuisance and annoyance of dealing with all such issues resulting from the Data

Breach.

105.  While Plaintiffs' and Class Members' PII has been stolen, Defendants continue to

hold Plaintiffs' and Class Members' PII. Particularly because Defendants have demonstrated an

inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and

Class Members have an undeniable interest in ensuring that their PII is secure, remains secure, is

properly and promptly destroyed, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring this class action individually and on behalf of all similarly situated persons under Federal Rule of Civil Procedure 23. Plaintiffs seek certification under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) of the following Nationwide Class (the "Class"):

> All persons in the United States whose Private Information was compromised in the Defendants' Data Breach announced to the public on December 30, 2024.

107.    The Class defined above is readily ascertainable from information in Defendants' possession. Thus, such identification of Class Members will be reliable and administratively feasible.

108.    Excluded from the Class are: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants', subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendants or their parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; (6) members of the jury; and (7) the legal representatives, successors, and assigns of any such excluded persons.

109.    Plaintiffs reserve the right to amend or modify the Class definitions as this case progresses.

110.    Plaintiffs satisfy the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

111.    **Numerosity**. Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on

information and belief, the Class consists of the approximately tens of thousands of individuals whose PII were compromised by Defendants' Data Breach.

112.    **Commonality**. There are many questions of law and fact common to the Class. And these common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, without limitation:

a.    If Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.    If Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    If Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    If Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e.    If Defendants owed a duty to Class Members to safeguard their PII;

f.    If Defendants breached their duty to Class Members to safeguard their PII;

g.    If Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h.    If Defendants should have discovered the Data Breach earlier;

i.    If Defendants took reasonable measures to determine the extent of the Data Breach after it was discovered;

j.    If Defendants' delay in informing Plaintiffs and Class Members of the Data Breach was unreasonable;

k.    If Defendants' method of informing Plaintiffs and Class Members of the Data Breach was unreasonable;

l.    If Defendants' conduct was negligent;

m.    If Plaintiffs and Class Members were injured as a proximate cause or result of the Data Breach;

n.    If Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

o.    If Defendants breached implied contracts with Plaintiffs and Class Members;

p.    If Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

q.    If Defendants failed to provide notice of the Data Breach in a timely manner, and;

r.    If Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

113.    **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach. Moreover, Plaintiffs and Class Members were subjected to Defendants' uniformly illegal and impermissible conduct.

114.    **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' counsel is competent and experienced in litigating complex class actions. Plaintiffs have no interests that conflict with, or are antagonistic to, those of the Class.

115.    **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully exposed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

116.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

117.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

118.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

119.    Likewise, particular issues under Federal Rule of Civil Procedure 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

120.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

121.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 120 of the Complaint as if fully set forth herein.

122.    Defendants required Plaintiffs and Class Members to provide Defendants with PII to receive Defendants' products and services.

123.    By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendants owed a duty of care to use reasonable means to secure and safeguard their computer system—and Plaintiffs' and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes so they could detect a breach of security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

124.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants holds vast amounts of PII, it was inevitable that unauthorized individuals would at some point try to access Defendants' databases of PII.

125.    After all, PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members. Thus, Defendants knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to them.

126.    Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

127.    Defendants' duty of care to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and Class Members, which is recognized by laws and regulations including but not limited to the FTC Act, state statutory law, and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

128.    Defendants failed to take appropriate measures to protect the PII of Plaintiffs and the Class. Any purported safeguards that Defendants had in place were wholly inadequate.

129.    Defendants breached their duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Class Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data breaches across several industries, and allowing unauthorized access to Plaintiffs' and the other Class Members' PII.

130.    The failure of Defendants to comply with industry and federal regulations evinces Defendants' negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII.

131.    But for Defendants' wrongful and negligent breach of their duties to Plaintiffs and the Class, PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the PII of Plaintiffs and the Class and all resulting damages.

132.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PII. Defendants knew or should have known that their systems and technologies for processing and securing the PII of Plaintiffs and the Class had security vulnerabilities.

133.    As a result of this misconduct by Defendants, the PII and other sensitive information of Plaintiffs and the Classes was compromised, placing them at a greater risk of identity theft and their PII being disclosed to third parties without the consent of Plaintiffs and the Class.

134.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in

Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Defendants' data breach; (x) the value of the unauthorized access to their PII permitted by Defendants; and (xi) any nominal damages that may be awarded.

135.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

136.    Defendants' negligent conduct is ongoing, in that they still possess Plaintiffs' and Class Members' PII in an unsafe and insecure manner.

137.    Plaintiffs and Class Members are entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

138.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 120 of the Complaint as if fully set forth herein.

139.    Defendants had duties arising under the FTC Act to protect Plaintiffs' and Class Members' PII.

140.    Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following: (i) failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII; (ii) failing to adequately monitor the security of their networks and systems; (iii) allowing unauthorized access to Class Members' PII; (iv) failing to detect in a timely manner that Class Members' PII had been compromised; (v) failing to remove former consumers' PII Defendants was no longer required to retain pursuant to regulations; and (vi) failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

141.    Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

142.    Plaintiffs and Class Members are consumers within the class of persons that Section 5 of the FTC Act were intended to protect.

143.    The harm that has occurred is the type of harm the FTC Act were intended to guard against.

144.    The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

145.    Defendants breached their duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

146.    Plaintiffs and Class Members were foreseeable victims of Defendants' violations of the FTC Act. Defendants knew or should have known that their failure to implement reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' PII would cause damage to Plaintiffs and the Class.

147.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

148.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

149.    Finally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

150.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 120 of the Complaint as if fully set forth herein.

151.    Plaintiffs and Class Members were required to provide their PII to Defendants as a condition of receiving Defendants' products and services.

152.    Plaintiffs and Class Members entrusted their PII to Defendants. In doing so, Plaintiff and the class entered into implied contracts with Defendants by which it agreed to safeguard and protect such information to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the class if their data had been breached and compromised or stolen.

153.    In entering into the implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards, and that Defendants would thoroughly vet and select vendors that adequately protect PII.

154.    Implicit in the agreement between Plaintiffs and Class Members and Defendants was Defendants' obligation to: (a) take reasonable steps to safeguard that PII, including through proper vetting of third party vendors to whom PII is provided; (b) prevent unauthorized disclosure of the PII; (c) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (d) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses; and (e) retain or allow third parties to retain PII only under conditions that kept such information secure and confidential.

155.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendants on the other, is demonstrated by their conduct and course of dealing. Defendants required Plaintiffs and Class Members to provide their PII as a condition of receiving Defendants' products and services. Plaintiffs and Class Members accepted the offers and provided their PII.

156.    In accepting the PII, Defendants understood and agreed that it was required to reasonably safeguard and otherwise ensure protection of the PII from unauthorized access or disclosure.

157.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants that Defendants would keep their PII reasonably secure.

158.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor and ensure that the PII entrusted to them would remain protected by reasonable data security measures and remain confidential, either in the hands of Defendants or one of their vendors.

159.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants by providing their PII at Defendants' request.

160.    Defendants breached the implied contracts made with Plaintiffs and the class by failing to safeguard and protect their PII, by entrusting the PII to a vendor that fails to safeguard PII, by failing to delete the PII of Plaintiffs and the Class or requiring vendors to delete information once the relationship ended, and by failing to provide accurate notice to them that their PII was compromised as a result of the Data Breach.

161.    As a direct and proximate result of Defendants' breach of these implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

162.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

163.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen its data monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third party vendors and the selection processes for vendors to which Defendants provides sensitive PII; (iii) submit to future annual audits of those systems and monitoring procedures; (iv) bolster its IT security measures; and (v) immediately provide or continue providing adequate credit monitoring to all Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

164.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 120 of the Complaint as if fully set forth herein.

165.    Plaintiffs and Class Members conferred a benefit on Defendants by entrusting their PII to Defendants from which Defendants derived profits.

166.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the

other hand, suffered as a direct and proximate result of Defendants' failure to provide adequate security.

167.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

168.    Defendants acquired the PII through inequitable means in that they failed to disclose the inadequate security practices, previously alleged, and failed to maintain adequate data security.

169.    If Plaintiffs and Class Members knew that Defendants had not secured their PII, they would not have agreed to disclose their data to Defendants.

170.    Plaintiffs and Class Members have no adequate remedy at law.

171.    As a direct and direct an proximate result of Defendants' conduct, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures or further entrustment to inadequate third party vendors so long as Defendants fails to undertake appropriate and adequate measures to protect the PII; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their

lives; (viii) the present value of ongoing credit monitoring and identity defense services necessitated by Defendants' data breach; (ix) the value of the unauthorized access to their PII permitted by Defendants; and (x) any nominal damages that may be awarded.

172.    Plaintiffs and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

173.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

174.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 120 of the Complaint as if fully set forth herein.

175.    Defendants became the guardian of Plaintiffs' and Class Members' PII. Defendants became a fiduciary, created by their undertaking and guardianship of Plaintiffs' and Class Members' PII, to act primarily for Plaintiffs' and Class Members' benefit. This duty included the obligation to safeguard Plaintiffs' and Class Members' PII and to timely detect and notify Plaintiffs and Class Members in the event of a data breach.

176.    Defendants knowingly undertook the responsibility and duties related to the possession of Plaintiffs' and Class Members' PII for the benefit of Plaintiffs and Class Members in order to provide Defendants' products and services to Plaintiffs and Class Members.

177.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members within the scope of Defendants' relationship with Plaintiffs and Class Members. Defendants breached their fiduciary duties owed to Plaintiffs and Class Members by failing to properly protect PII. Defendants further breached their fiduciary duties by failing to timely detect the Data Breach and notify and/or warn Plaintiffs and Class Members of the Data Breach.

178.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII in Defendants' continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

179.    As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

<u>COUNT VI</u>
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Class)**

180.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 120 of the Complaint as if fully set forth herein.

181.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

182.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Defendants is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injuries as result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

183.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Defendants owes a legal duty to secure PII and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTC Act, and various state statutes, and (b) Defendants continues to breach this legal duty by failing to employ reasonable measures to secure PII in Defendants' possession.

184.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect PII in Defendants' possession and control.

185.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach targeting Defendants. The risk of another such breach is real, immediate, and substantial. If another breach targeting Defendants occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

186.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

187.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach targeting Defendants, thus eliminating the additional injuries that would result to Plaintiffs and Class Members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, request the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiffs as the Class Representatives;

B.    A mandatory injunction directing Defendants to adequately safeguard the PII of Plaintiffs and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendants to delete and purge the PII of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' PII;

v.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi.    prohibiting Defendants from maintaining Plaintiffs' and Class Members' PII on a cloud-based database until proper safeguards and processes are implemented;

vii.    requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii.    requiring Defendants to conduct regular database scanning and securing checks;

ix.  requiring Defendants to monitor ingress and egress of all network traffic;

x.  requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class Members;

xi.  requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii.  requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants' networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii.  requiring Defendants to meaningfully educate all Class Members about the threats that Class Members face because of the loss of Class Members' confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

C.  A mandatory injunction requiring that Defendants provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII to unauthorized persons;

D.    Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen PII ;

E.    An award of damages, including actual, nominal, consequential damages, and punitive, as allowed by law in an amount to be determined;

F.    An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.    Granting the Plaintiffs and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.    For all other Orders, findings, and determinations identified and sought in this Complaint; and

J.    Such other and further relief as this court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated: February 14, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: _____
Lee Albert (PA ID # 046852)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
lalbert@glancylaw.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
JOHN A. YANCHUNIS (*Pro Hac Vice forthcoming*)
jyanchunis@forthepeople.com
RONALD PODOLNY*

ronald.podolny@forthepeople.com
ANTONIO ARZOLA, JR.*
ararzola@forthepeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Phone: (813) 275-5272
Fax: (813) 222-4736

*Attorneys for Plaintiffs and the Proposed Class*